UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

C.A.NO.: 8:13-CV-1675-T-27TBM

----------------------------------------------x

IAG LLC,

Plaintiff,

VS

NATIONAL UNION FIRE INSURANCE CO.

OF PITTSBURGH, PENNSYLVANIA,

Defendants.

------------------------------------------------x

DEPOSITION OF NICHOLAS E. BIERY, Ph.D., P.E., taken on behalf of the Plaintiff, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Tara L. Wosny, Notary Public and Certified Shorthand Reporter, within and for the Commonwealth of Massachusetts, at the offices of Goudreau Court Reporting Service, Inc., 101 Federal Street, 19th Floor, Boston, Massachusetts, on Thursday, November 20, 2014, at 1:00 p.m.

APPEARANCES:

MICHELLE MELIN NIEMEYER
2665 South Bayshore Drive, Suite 700
Miami, Florida 33133
305.443.1818
BY: Michelle M. Niemeyer, Esq.
mniemeyer@paymyclaim
Counsel for the Plaintiff

GOLDMAN & HELLMAN
1731 Beacon Street, Suite 511
Brookline, Massachusetts 02445
617.320.9854
BY: Steven Goldman, Esq.
Michael I. Goldman, Esq.
Goldman.mig@gmail.com
Counsel for the Defendant

I N D E X


WITNESS: NICHOLAS E. BIERY

By Ms. Niemyer 4


EXHIBIT INDEX


| | | |
|---|---|---|
| 13 | Notice of Taking Deposition | 4 |
| 14 | Defendant's Expert Witness Designation | 10 |
| 15 | Curriculum Vitae | 15 |


(Exhibits Retained by Court Reporter to be attached to transcript.)

P R O C E E D I N G S

* * *

NICHOLAS E. BIERY, Ph.D., P.E., the witness, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows in answer to direct interrogatories:

* * *

(Notice of Taking Deposition received and marked for identification as Exhibit No. 13.)

* * *

MS. NIEMEYER: I'd like to start off by just taking everyone's name around the table. I'm sorry, I didn't catch your first name.

MR. GOLDMAN: Michael Goldman.

MS. NIEMEYER: And you are?

MR. GOLDMAN: Counsel for National Union Fire.

MS. NIEMEYER: Okay. I just wanted to make sure we have you on the record since you're new to the party. Okay. We have Steven Goldman.

* * *

EXAMINATION BY MS. NIEMEYER:

Q. And you are Nicholas Biery, correct?

A. Yes.

Q. How do you spell your name?

A. N-I-C-H-O-L-A-S, and my last name is B-I-E-R-Y.

Q. Okay. Mr. Biery, are you here pursuant to a Notice of Deposition today?

(Witness viewing document.)

A. I am here because I was asked to be here.

Q. Okay.

A. By Mr. Goldman.

Q. The document that I just handed to you, which has been marked as Exhibit 13, is a Notice of Deposition. Did you have an opportunity to see that notice?

A. No, I don't think I've looked at it before.

Q. Okay. Can you take a look at the list, which is named Addendum A at the back of that. Take the time you need to read that, and let me know when you're done.

(Witness reviewing document.)

A. Okay.

Q. Okay. This addendum, which was included with the notice, and which is the reason I'm assuming

that you came here today with your file with you, but I want to just clarify with you, does this contain -- and let's just start with...

MS. NIEMEYER: We'll mark this.

MR. GOLDMAN: I can tell you he's brought with him his file, but I could also tell you, Counselor, that it is not my intention -- I don't want you to deduce that I have responded to the Addendum A attached to your Notice of Taking Deposition because your Notice of Deposition is dated November 14th, and today is the 20th.

If you did intend this to be compulsory -- that is, the production of documents to be compulsory, then this Addendum A is innutile because under the Federal Rules of Civil Procedure, requests or subpoenas seeking documents have to comply with Rule 34, which would have allowed us 30 days to respond --

So for that reason, while it is a coincidence that he brought his entire file and that his entire file -- rather than making an issue or a problem -- I have produced it for you. But that is as a courtesy and in no way

because I take your Addendum A to be compulsory, and I want that to be clearly understood.

MS. NIEMEYER: Okay. I'll just state for the record that I disagree with your reading of the rules on that. There is certainly a 30-day requirement when you are seeking documents from a party, but that rule does not say that with respect to documents from a deponent who is a nonparty.

MR. GOLDMAN: We can test that at any time you like.

MS. NIEMEYER: You're welcome to test that and --

MR. GOLDMAN: Superfluous because it's a pure coincidence that you have his entire file.

MS. NIEMEYER: Okay. Counsel, I don't intend to make this an issue.

MR. GOLDMAN: Great.

MS. NIEMEYER: Except that we're documenting it for the record.

MR. GOLDMAN: Terrific.

MS. NIEMEYER: And I need to know what I have.

MR. GOLDMAN: Terrific.
MS. NIEMEYER: So I'm going to -- and we'll mark these documents, and I'm going to need you to enter this as part of the record.
This collection will be a composite Exhibit 14.
(Folder File received and marked for identification as Exhibit No. 13.)
BY MS. NIEMEYER:
Q. Okay. So I still need to document so that we understand what we have here.
To your understanding, does this file folder which was has been marked as Composite Exhibit 14, does that comprise all written communications between you or other employees of SEA and any other person or entity regarding your work as an expert witness related to the partial sinking of the vessel It's All Good?
A. I'm pretty sure it doesn't include everything because there will be invoices that went back to -- IAG I think is the retaining entity.
There are e-mails that aren't printed out, that sort of thing. But it has everything that I look at or rely on or thought was

important technically. That's what I put in my file.

Q. Okay. At the time when the expert witness or the expert witness reports were due in this matter, were you asked for a copy of this information, the materials you relied upon, to provide at that time?

MR. GOLDMAN: object to the form.

A. I don't recall.

Q. Is this the first time that you provided these documents to counsel?

A. I may have forwarded some of them, or I'm pretty sure I sent photos at some point.

Q. Okay.

A. I don't know piecemeal what in there I provided previously or not, but I'm pretty sure I provided photos previously.

Q. Okay. Does this file contain any notes maintained by you and related in any way to your opinion rendered regarding the partial sinking of the vessel It's All Good?

A. Yes.

Q. Does it contain all materials reviewed by you or otherwise you relied upon in rendering your

opinion as an expert witness with respect to the partial sinking of the vessel It's All Good?

A. No. I have a little folder of copper corrosion articles that I use on a bunch of cases somewhere in my office. I also probably looked at the ASM Handbook, if I had to guess. I think I read the report back in 2010, so it's been a while.

So there will be some reference material. I didn't copy that and put it in the file.

Q. Okay. Is your written contract of retention or any other written documentation related to your retention as an expert with respect to the partial sinking of the vessel It's All Good contained in that file?

A. Accounting might have an actual work agreement or -- I don't know what was in place at this time. With some clients, we require work requirements, with some clients we require retainers whether we work with them and payment history and things like that; accounting would maintain that.

There is in there our internal -- I

think now it's a PIF, or Project Information Form, so that is the stuff that's stapled on the front of mine and it will be the first few pages in your copy.

Q. Okay.

(Defendant's Expert Witness Designation received and marked for identification as Exhibit No. 14.)

BY MS. NIEMEYER:

Q. For reference, this document that was just marked as Exhibit 15 is the Defendant's expert designation.

Mr. Biery, I just want to confirm that the person who is next to letter A, Nicholas E. Biery, Ph.D., is you; is that correct?

A. That's correct.

Q. Okay. And what exactly were you retained to do as an expert witness in this case?

A. To examine a piece of we called the coil that's basically the heat exchanger, that is part of this air-conditioning unit in this case and determine the cause of the hole in it or the holes. There were holes both in the inner tube and the outer tube.

Q. What were your instructions exactly in that context? Were you given any information around what happened?

A. I think in the back of the file will be some e-mails from Frank Micari, who was the, I guess, he's an adjuster -- that I was talking to at the time who retained us. He provided some --

Q. You have your own copy of that?

A. Yes, I do.

Q. Feel free to look in there and if you see what you're referencing, we can identify that.

A. Sure. So it would be -- were these two pages which are what I provided to my admin to do, perhaps, the conflicts check, but to set up the file.

Q. Okay. And just to help the record on this. There are two e-mails. The first of those e-mails has the date 11/9/2010 at the bottom, and Techton Marine Consulting at the top. It is from Frank Micari to Techton Marine Consulting, mailed on November 9th at 9:05 a.m.

The second of which is dated -- it's from Frank Micari to Nicholas Biery, Tuesday, November 2, 2010 at 8:18 a.m. I'm going to give

those back to you so that you can use those if you need to in answering my question of what exactly you were told about the circumstances so that you could give an opinion regarding the cause of the holes in the material that was sent to you.

A. Sure. There were a number of photographs, which I believe are the photographs that are included in this file. There is also two short Techton reports. The critical thing here, I guess, from my point of view, is in the center paragraph it says, "At this point in our investigation, we are curious as to the cause of failure of the inner and outer tubing."

Then there are some details, "the primary elements involved are salt water, electricity and copper tubing."

Do you want me to read this out for you?

Q. You're reading from the -- yes, please. I'd like to understand what it was, what was the scenario that you were addressing when you were given this question. There had to have been facts that you were assuming or relying upon or

understood to be the scenario that you were analyzing, and that's what I'm trying to understand.

A. Sure. It was just to look at the coil, which was all that was sent to you us. I'm calling it a coil then. It's that water-to-water heat exchanger.

We were just asked what were the causes of the holes in it. And the information that was provided was, you know, the inner copper tubing is the tube through which salt water flowed, and the outer tubing is where the refrigerant flowed. And then it says, "The primary elements involved are salt water, electricity and copper tubing. Additionally, the cooling fins appear to be aluminum and the outer shell of the unit appears to be painted steel."

And this was when he asked us for cost and budgets and things like that. I think we followed this up with a phone call to talk about those things.

Q. Okay. Do you have an understanding of why Mr. Micari would have said to you that the

primary elements involved are salt water, electricity and copper tubing?

A. I don't know why he included electricity. I know salt water was what was in it and the outer part is a copper tube, but I don't know how much information he had. He was -- what I take from it is, he's just curious as to what caused these holes.

We're looking at the component, and I'm sure I had conversations with him at the time, and it was a fairly short turn around back when we looked at it about what were the details of operation and things like that. I didn't make formal notes at the time. So what I understood was he wanted to know what caused the holes. He said it was involved in the sinking of a vessel, but we didn't analyze the larger incident, just what caused the holes.

Q. Okay. So was there any analysis that you did which relied upon research beyond the tubing itself and analyzing that tubing?

A. No. I mean, we have to look at -- cupronickel alloys are commonly used for some things, seawater piping is one of them. So clearly we

looked at the reference materials around copper and cupronickel tubing. We didn't investigate other aspects of the operation of the vessel or anything like that.

Q. Okay.

(Curriculum Vitae received and marked for identification as Exhibit No. 15.)

Q. Mr. Biery, can you identify for me what that document is?

A. It looks like it's a recent copy of my C.V.

Q. Was that provided by you to counsel for IAG in this matter?

A. I don't recall. Presumably it was provided by me or by my assistant.

Q. Okay. Can you just take a look at that and let me know whether that is an accurate depiction of your historical experience, at least up to the time when you have done the work as an expert in this matter.

(Witness viewing document.)

A. Yes. Attached to the C.V. there is also a testimony log, which internally we refer to as our Rule 26, which goes back four years, I believe, in terms of our testimony. Since

then -- some of these items on the bottom will have dropped off because they will be more than four years ago, and I've also had a couple of depositions this year.

Q. Okay. So we can get up to date on that. Other than the depositions on this list, more recently, what other depositions have you given this year?

A. I'm trying to remember. I had one that involved a fire in a BMW that was parked in someone's garage. Wait, that's the top one here. That's what that one is.

I had a deposition in a case that involved a failure of an aluminum cane.

Q. As in something someone uses to support themselves while they walk?

A. Yes, a walking cane, an assistive device, yes, that kind of a cane.

Q. Okay.

A. And then earlier this week I had a deposition in Chicago on a case that involved electrofusion, the joining of some polyethylene pipe. I think there might be another one in there, but I don't remember what it was.

Q. Did any of those depositions involve the uses of materials in a marine environment?
A. No.
Q. Did any of them involve cupronickel metals?
A. No, no cupronickel alloys.
Q. Okay. And of all of the depositions you've given, have you been involved in any testimony -- in this question I'm not limiting it to the four-year period that your list entails but in all of your experience -- have you been retained previously as an expert in a matter that involved a marine air-conditioning system?
A. No.
Q. Have you been retained in any matter involving any sort of marine systems?
A. Yes.
Q. What would those be?
A. I've been retained in a matter -- do you want just the ones that I provided testimony?
Q. No, I want to go beyond that. To what you can remember, I'd like to know what cases you've worked on that involved marine issues.
A. Sure.

Q. Sorry I didn't mean to speak over you. I'll try not to do that.

A. Okay. I've looked at a gear on a device to control some rigging on a sail boat. I've looked at some hold down or tie downs from a cargo vessel. I've looked at an exhaust system on a yacht. I've looked at a fuel tank on another vessel. I've looked at other portions of the fuel system. I've looked at an engine for a smaller vessel, an inboard diesel engine, but on a 20-foot boat.

Q. That's unusual, an inboard diesel on a 20-foot boat?

A. It was like a small, fast boat. I can't remember the details of it, but a smaller boat. It was expensive to replace it is why we were looking at it.

Q. Sure.

A. I'm trying to give you a complete list. When I first started, I think we looked at some stairs from -- I think it was a fishing boat. They had resurfaced the top of the polymer material over the original steel deck, and they were having some issues.

Those are the ones where I've been a significant part of the investigation. There are others where we have engineers who will ask us small materials-related questions and I'll answer. So I get a lot more of those kinds of questions through a year and it's hard to keep track of those sorts of things.

Q. Okay. Of those times that you mentioned that you've worked on marine-related claims, how many of those resulted in testimony, whether it's on this list or not?

A. I don't think any of those have gone to court or even to deposition.

Q. Okay. So none of the items on this list, then, that was provided to me would involve marine issues?

A. I believe that's correct. That is correct.

Q. Mr. Biery, I see that you're licensed in a number of states, Michigan, Ohio and Texas, if this is correct. Is that a complete list?

A. It is.

Q. Are you licensed in the State of Florida?

A. I am not.

Q. Have you been?

A. No, I have not.
Q. Okay. I had a question about the publications list that's included in this document.
A. Okay.
Q. Without going through all of these, are any of these publications applicable in their topic to the type of issues that you have discussed in your expert opinion in this case?
A. Let me just take a look and make sure there is no aspect of any of these that's relevant.
No, I don't think any of these are particularly relevant.
Q. Okay. And I had -- really, reviewing it, the only one that I saw that even by a stretch might have something to do with it would be the one entitled, "A Method For Measuring Microstructural Scale Strains Using a Scanning Electron Microsope."
Could that have any relevance at all?
A. No.
Q. Okay. All right. So I am going to move on to the next document which has already been marked as Exhibit 11.
So as we go through these questions,

Mr. Biery, I have hard drive copies here of all of the documents that were provided to me that were considered backup to this report. There were photographs. There were SEM analysis printouts. To the extent that you need to refer to any of that, we can pull it up and identify if there is something that you feel would help you answer a question. I want you to have the option to do that.

A. Okay.

Q. Okay. So I just wanted to let you know that that's available and it's accessible, and if there is something that you want to say, look, this is the thing I relied on or this is the -- that's the basis for that, that would be helpful. I'd like to be able to identify those things because what we've got is an enormous amount of information that I'm sure you understood better than anyone here at this table what it is.

A. I understand. I'll try to do that for you.

Q. So not all of it is referenced with any specificity in the report. So, like I said, if there is something that you feel you can point

to in the SEM printout or to a photograph, and you want to look through those documents to show me what it is, I'd like you to do that for me, okay?
A. Sure.
Q. Okay. So I'd like to start by just asking you to identify this document.
A. It looks like my report in this matter. Yes, it looks like it's all here.
Q. And I notice at the end of the report there is another person named Robert S. Carbonara. Who is Robert Carbonara?
A. He's one of the other materials engineers at SEA. Every SEA report has a reviewer, a technical reviewer, and that's what he did in this case, is review my report.
Q. Can you explain what that means? As a technical reviewer, what is his role?
A. Sure. His role is to go through the report and make sure that everything is explained clearly, and also that the conclusions reached are supported by the material that's in the report. He, of course, does not go through the entire file or redo the analysis, but he's making sure

that based on what is in the report, the conclusions make sense, that it's thorough and explains the issue that was being examined.

Q. Okay. So I'm going to walk through this rather slowly. So I'm just going to start from the beginning. If you feel at any time as we're going through it that you need to go to a different part of the report to make your explanation make sense, feel free to do that, okay?

A. Okay.

Q. And you can let me know that.

A. Okay.

Q. So I want to just start at the first paragraph, frankly, where it states, "When the package arrived, it contained six pieces of copper and cupronickel tubing and a small quantity of loose debris inside the shipping bag."

Is that package that you described there what you received and were asked to analyze?

A. That's correct.

Q. Was there any other package or any other material sent to you at any time to analyze?

A. No.
Q. Okay.
A. Other than for clarity, there were reports from Techton and photographs, but no other physical materials.
Q. Okay. And is it correct that you had the reports from Techton at the time or before you wrote this report?
A. I don't recall. I would guess yes. I think so because I think -- yes, I did because it says I did on the bottom of the first page.
Q. Okay. So you relied upon Techton's reports in at least providing you some background information; is that correct?
A. That's correct.
Q. Okay. Did you have any involvement in instructing the people who cut the tubing out of the air-conditioning unit about how to cut it so that you could provide your analysis?
A. No.
Q. Was it cut in a way that you feel gave you an adequate opportunity to analyze what you were provided?
A. Yes. We were able to look inside the end of the

tube and see the holes or the penetration in the inner cupronickel tubing, and we were able to review it reasonably well, although not capturing particularly good photographs of it. But we were able to see it -- to observe under a stereomicroscope.

Q. Okay. And it would be your normal procedure with the stereomicroscope to take photographs as you were looking through that microscope; is that correct?

A. If we can get adequate light on the area of interest to capture a good photo -- in this case, we were doing a nondestructive exam; that is, we were not cutting apart, doing anything else to cut apart the tubing.

We were looking at it, and we had an adequate view of the penetrations in the tubing to interpret them. So that's what we did.

Q. Were you ever asked to do a destructive exam?

A. No.

Q. Would you have wanted to do a cupronickel exam?

A. It wasn't warranted based on the budget. You know, we had a fairly small budget and we can tell what happened based on what we can see. I

mean, we had -- like I said, we had an adequate view of the penetrations on the inner tube to interpret the cause.

Q. Had you not been restricted by the budget, would you have done a destructive examination to see those options more clearly?

A. If we were told that the matter was in litigation and that there were other parties present so that in doing destructive examination we wouldn't -- we would prepare a joint protocol and all of that, and we knew that the scope of the loss was sufficient and all of that, maybe it would make sense to do that in conjunction with the other parties. But at the time we were providing an interpretation or analysis of what caused those holes, and it wasn't necessary to do more than what we did.

So there was no real reason to do it, but we may have done more if it had been a bigger matter. Do you understand what I mean by that?

Q. Why don't you clarify it.

A. Sure. Always in a matter like this or any loss, you're examining -- or in a failed component

you're examining, you have an understanding of sort of the scope that you need to follow because you could spend hundreds of thousands of dollars analyzing a component in terms of lab time and all kinds of complicated testing for a $5,000 loss.

So when we're asked to examine it and determine the cause of failure, we normally start conservatively, and if we have enough information without doing a destructive examination and further testing to come to a conclusion to a reasonable degree of engineering certainty, which we did in this case, then we won't proceed with a destructive exam.

If it's already in litigation, normally the other side will want to go further. In that case, we would probably end up in a destructive exam.

Q. Okay.
A. Did I make that clearer?
Q. Yes, thank you.
A. Okay.
Q. Okay. So let me go to the second paragraph where you give a more descriptive explanation.

You're discussing the six pieces of tubing, and you're indicating that there were six pieces, including three sections of helically crimped tubing inside an outside tube without inlets or outlets.

I was a little bit confused by that part where you reference "without inlets or outlets." What did you mean by that?

A. I mean on those three sections of tubing, there are no tubes leading into them.

So when this thing was cut apart, there are portions of it that have tubes that feed into this heat exchanger coil. Those are the two ends basically or close to the ends, and then there are three sections in the middle that do not have separate tubes leading into them.

Q. Okay. Do you have a document there? Do you have a photograph that would help?

A. Certainly.

Q. I'm sure that there is probably one in the collection that we have.

A. Yes. We can go from photograph 7.

Q. Okay. Seven. So just to explain, composite Exhibit 14, it's part of a collection of

photographs with a title at the top that says, "Marine AC Coil Exam, 11/19/2010, page 1 of 12, and this is the one that says at the bottom -- that says number 7.

A. All right. So when we look here -- do you mind if I use your pen to indicate here?
So what I was referring to in saying that, is that there are two sections that include this large one here that has this piece of tube that's going into it, which is an inlet or outlet and the end has an inlet or outlet.
These other pieces are essentially elongated cylinders that consist of an inner helical tube and an outer tube. So no other tube is joining them.

Q. Okay. And would it be fair to describe this as -- if it hadn't been cut in pieces -- a continuous coil or a continuous tube, let's say, with two end pieces which then would have had another tube connecting them to something else?

A. And also there is a little short piece of tubing right here. So one of the things you just called an end piece that has the tubes that connected is not actually the end of what we

have.

Q. Are you aware of what that was, that piece where it connected to or what its purpose was?

A. It's a piece of the inlet or it is a piece of tubing that contained seawater. It's a piece of cupronickel tubing at the end of the coil, but it's not a portion that's the heat exchange portion. It does not have an outer tube to it.

Q. Okay. I see. So the heat exchanger portion, which would be commonly referred to --

MS. NIEMEYER: Steven, correct me if I'm wrong.

Q. -- in the industry as the cooling coil?

A. Yes.

Q. Okay. Is the portion which has both a coolant section and a section that raw water or salt water runs through?

A. That's correct.

Q. Okay.

A. So at the end, we have a piece that doesn't have the coolant section.

Q. What was the material of that section?

A. By appearance it's a cupronickel tube. It's the same 90 percent copper, 10 percent nickel,

roughly, material as the inside of the coil.
Q. Okay. And then at some point there is an area added to it which then would contain the coolant; is that correct?
A. Yes.
Q. That's outside of that cupronickel section?
A. That's correct.
Q. Okay. The reason I was confused when I read that portion was that it seemed that it could have places that would create -- that just water would just sit there. So that's not really the case. This is a coil that water started in one end and ran through to the other end, correct?
A. Yes. My interpretation would be since it's tubing, there is an obvious inlet and outlet. When I was referring to inlets and outlets, I was referring to other things feeding in other than the main tube.
Q. Okay. Now, you say here, "The cut edges of the inner tubing are light gold in color consistent with cupronickel tubing with less than 15 percent nickel, while the cut edges of the outer tubing are copper colored."
Now, is that just based on a visual

observation?
A. Yes.
Q. Did you later do testing to determine the accuracy of that visual observation?
A. When we put them in the SEM, a piece of it in the SEM, we did collect chemistries on the base metal.
Q. What piece of it did you put in the SEM?
A. I think the shortest piece of the coil that has the exterior hole in it that also you can see the interior hole from the end of that piece of tubing.
Q. Okay. Were there multiple locations tested with the SEM?
A. Well, there is that one piece of tubing. And on that one piece of tubing, yes, multiple areas were assessed by EDS, and I think we only recorded a couple EDS spectrum.
Q. Okay. And just because this may be used by people who are not as technical as you, can you explain for the record what is an SEM and what is an EDS, and what is the difference between them?
A. Yes, I can do that. Okay.

SEM stands for scanning electron microscope. So a crude way to think of it is like the TVs we had when I was growing up where there is a tube, and on the back there are electrodes and on the front there is a phosphorous screen. The electrons go from the gun in the back -- it's called a gun -- and go and hit the screen.

You have coils that scan across the screen, and that's what makes the picture in the TV. In a scanning electron microscope, we use the same sort of gun. And what we do is we shoot electrons at the sample. And then there is coils, to scan them across the sample. And rather than projecting it, it doesn't hit the screen, it hits the sample. And then we have another detector in there that can see or detect the electrons that are either bounced back from the sample is one kind of detector, or electrons that are emitted from the sample or escape from the sample, are back scattered as we call it, where they have less energy.

So we have a couple different kinds of detectors. But what it allows us to do in a

broad sense is to make a picture, see a picture of it. There's an attachment that we can put on that we call an energy dispersive spectrometer. There are different names for it. Usually we just call it EDS for energy dispersive spectrometer, but we have a separate detector, and rather than seeing the electrons, it sees the x-rays that are emitted.

So this is fairly technical, I guess. When the electrons hit the sample, they knock electrons out of the orbits in the atoms in the sample. And when that happens, an electron will get promoted, we call it, to a higher energy state, and then it will fall back down. And when it falls back down to the resting energy state, a high-energy x-ray is emitted. That high-energy x-ray is characteristic of the orbital of the atom that was being impacted by the electron or affected by the electron.

So we get -- when the electron beam hits the sample, we get electrons out that are characteristic of the elements in the sample, and that's what we use the EDS detector for is it can tell us what the energies of those x-rays

are, and from those energies we can interpret what elements are present in the sample.

Q. Okay. So is it fair to say, then, that you would use EDS to identify, for instance, what are the elements in a piece of metal that you put in that machine to test?

A. Yes.

Q. Okay. In a simple way that people would understand?

A. Yes. I just wanted to be thorough.

Q. No, I understand. I'm doing this because we may one day have this transcript either read to a jury or have a judge read it, and sometimes we want to make sure that it's clear what the purpose is.

So the purpose of this testing -- am I correct in understanding, the purpose of this testing is to test the material and determine what elements are in the material?

A. Yes. That can be the metal of the tubing or debris that's present on its surface or the oxide layer that's on the surface of the metal.

So anything that's in the SEM we can point the electron beam at and determine what

elements are in it, what its chemistry is we say.

Q. When you described the package that arrived, you said that there was a small quantity of loose debris inside the shipping bag. Was that tested?

A. No, I believe it was put back in the bag or left in the bag. It appeared to be similar in composition to material that was still adhered to the inside of the tubing.

Q. Do you know how long the tubing sat before it arrived at your office?

A. I have a Transfer of Custody form that might tell me when it was shipped. And by looking at the Techton reports, we might be able to determine when it was cut which would allow us to determine how long it was between the cutting and shipping to SEA.

Q. Okay.

A. But I haven't looked at that.

Q. Okay. But that information is contained here?

A. I believe so. I haven't checked.

Q. I know I saw a chain of custody report. Can you just quickly look at that folder. I know it

exists. I just want to see if we can identify that date.

A. Yes. It looks like it was shipped to us on November 9, 2010, and we received it on November 11, 2010.

Q. Okay. Do you know when you did the testing of the materials?

A. It looks like the photographs were taken primarily on November 19th, but I have some SEM on November 18th. So November 18th and 19th.

Q. Okay.

A. According to the information that's at the bottom of the photographs, which I assume to be correct.

Q. Okay. I know that somewhere we have a Techton report that does reference removing -- I'm not sure when that is.

A. Do you want me to try to look for that?

Q. Yes, please. Actually, I think I found it. Take a look at that one.

A. Yes. It looks like the report on October 15th indicates that it had been cut previously, and the photographs shown in this report dated October 14th, show the tubing cut.

Q. Are you aware of when water passed through that tubing last prior to the tubing being removed from the vessel on October 14th?

A. I believe the Techton report says that they conducted some flow testing or testing to assess how much water passed through the holes in the tubing on or around that date.

It looks like in the report we can see a bucket below the air-conditioning unit, also in a photograph dated October 14, 2010. So it looks like that was the last time water was passing through the tube. It was early and on that same day of sectioning.

Q. Do you know when the last time seawater flowed -- actually from a body of seawater -- flowed through that tubing as opposed to something coming from a hose?

A. I'll see if the earlier Techton report provides that information. I'm quite positive I had two Techton reports in my folder earlier today. I don't see it right now. Maybe my recollection is not correct.

Q. Okay.

A. Wait, no. It looks like they got stapled

together after photocopying earlier today.
Q. Okay.
A. So there is a report dated September 30th that --
Q. Got it. That's stapled to the back of the other one?
A. Yes. It was not, prior to today. It says in here that they were -- and this occurred at Embree Marine -- that water was pumped through the intake line of the condenser. And I do not know -- that appears to be before it was removed from the cabinet and put on a bench. So it may have been seawater. Because it says, the unit was assessed in our cabinet in the captain's quarters. So presumably that would be seawater at that time.
It does appear that the later part of that report has photographs dated September 30th, but I do not know -- I'm not sure of the convention here. You might have to get that from Techton whether that 9/30/2010 that's mentioned right here indicates that that's when the entire exam occurred.
Q. Okay. And whether it was in the water at that

point or not. Okay. Now, you mention here in this report that, "Holes were present in the outer copper tubing in several locations and holes were also present in the inner cupronickel tubing near the holes and the outer tubing."

A. Yes.

Q. And then you say, "The side of the outside tubing adjacent to one hole is abraded, as if by relative motion between the coil and some other piece of metal."

A. Correct.

Q. Did you do anything to investigate what could have caused that?

A. Let me look at my photographs. The short answer is that I believe that I did not place a lot of emphasis on that information because if we have a hole only in the outside, and we lose the freon in the unit, which is what would happen if we have a hole on the outer tubing, it won't cause the inner tubing to corrode.

So an outer hole like that is not something that would cause the failure that resulted in water into the vessel. So it seemed to be likely caused either by the disassembly

process or movement of the AC unit when it was removed from the unit, or perhaps just a minor amount of abrasion in the cabinet that did not result in a hole. Because if we had lost the freon previously, you should have -- the owner of the boat should have noticed a loss of cooling performance. His unit would have stopped working, and it also would not have had anything to do with the hole in the inner lining. Is that clear?

Q. I believe so. Could vibration have caused that?

A. Yes, possibly.

Q. And did you look at the photographs of the unit prior to its being removed from the box, and those I believe were in the Techton report?

A. Yes. I believe there may be some larger-sized versions of those in the documents in my file. I did look at those photos, and there is fairly significant damage, I'll call it, to the unit.

Q. This is just a general question. When you took on the testing that you were doing, were you aware of how the pieces related to the system as a whole -- and when I say the system as a whole, I mean the marine air system and how that system

was put together generally?
A. Do you mean did I understand how it was plumbed into the vessel like the path of the seawater?
Q. Yes, as well as where it sat and the physical structure of the system.
A. No. I was focused purely on this one component that was submitted to me for analysis, not the system as a whole.
Q. Okay. Did you measure how many holes exists or how big they were?
A. Not formally. I will say that there were several holes. I did not measure the dimensions of those holes with any accuracy. At the time I believe I looked generally with a scale, but I did not attribute a lot of significance to that in regard to my assignment, which was to figure out why there were holes or the amount of water that might pass through them. So I did not consider the size particularly important.
Q. In the condition that your samples were in when they were received by you, would it have been possible for you to accurately determine the flow rate that would have come out of those holes?

A. It might be possible to reassemble the unit to -- not without doing some work to try to put things back together and you wouldn't have all of the bits and pieces that you would need for that assessment; that is, if you were trying to figure out how much water came through that, you really would want it hooked up. You would want to know what the flow conditions were at the inlet to the unit.

So you couldn't do it on just an isolated coil without the attached piping and pump. It would be possible to go back. And if this unit was replaced, you could measure the flow rate and piping that's still on the vessel and figure out what the actual flow is.

There are meters that you can do on the -- used on the outside of the pipe to figure what the flow on the pipe is with all of the systems operating. It would be possible to do that and then apply that, that flow to construct piping similar to the piping that would be present in the unit, put this piping back together potentially and develop a reasonably accurate simulation of what it would see in

service. I think that would be possible to do if you devoted enough resources.
Q. It's fair to say that the resources were not devoted and that was not part of your job?
A. That was not part of what I perceived my assignment to be.
Q. Okay. Moving on to the part where you have a section entitled, Observations. You mentioned in the second sentence, "The coil consisted of approximately one and two thirds loops. An examination of the assembled portions show that the largest holes on the outside tubing were aligned when assembled."
I wasn't clear what you meant by that when you say, "The largest holes on the outside tubing were aligned when assembled."
Can you explain what you meant by that?
A. I believe I can with reference to the photographs.
Q. Okay.
A. So if we look at photograph 11 in the bundle of photographs entitled, SEA project 153897. It's on page 2 of 12. If you look, you can see two outside photographs that appear to be right

above each other in the orientation of the photograph.

Q. Okay.

A. So you can also see the mineral deposits on the outside of the tubing. The way this would be oriented in-service based on the mineral deposits which would have occurred in-service, would be that the sort of -- the viewer's position would be down. You'd be looking at this from below. So both holes are sort of to one side of the bottom of the coil.

Q. Okay. Have you seen the photographs that were -- why do you believe that's the bottom?

A. I believe that's the bottom based on the circular mineral deposit here. When water sits wet on the bottom of a piece of tubing, it will leave a circular impression as it dries around the top surface of the water.

Now, I know there are other photographs. I can look at those if you'd like.

Q. Let's just take a second and look at these Techton photos and see if what I want you to look at is even there. It may or may not be.

Let me ask you: The photos that are

here in your folder that are attached to the Techton reports that we have here, are they the only photos that you saw related to this system when you made your opinion, when you wrote your opinion?

A. I had these bundles of photos also that were submitted to me.

Q. Okay.

A. Which may have more photos that are not present.

Q. Let me just see what is there, and there might be a blowup of what I was about to point out.

Okay. Let's go into this larger section here.

A. I have a correction to make.

Q. Okay.

A. There are two reasons that you have that circular pattern. And based on this, I think I did -- because I did say that the holes were a few inches -- were at the very bottom. I think the holes are actually here on one side, and those dried-on patterns are where water was touching the side wall. There was a housing here, a cover, and the water was touching the cover and dried there.

So I think I was recalling incorrectly these dried patterns here at the bottom. I believe actually they're the side and the holes are below them. So this would be contacting the side of the housing. It might be the correct orientation.

Q. So if that's -- I'm going to direct you to one of the photographs that was in a packet. You have a packet that has -- I wouldn't call that a cross-section. I guess you'd call it an end section of the tubing dated October 14, 2010.

Within that packet, on probably the fifth page, there is one dated 9/30/2010 that has a pen on the left side, and you see there -- is this the area of the tubing to your understanding that you're discussing where the holes were?

A. I can't remember based on that photo. I believe that's correct.

Q. And does that confirm for you, then, your understanding that that was actually along a side wall?

A. A few inches above the bottom. I believe my interpretation of this would be that this is the

bottom. This is where a housing was contacting the side and water dried, and these are the two holes which are a few inches above the bottom sort of.

Q. Okay.

A. They are still aligned as I indicated.

Q. Is it fair to say that they're not, then, at the bottom where water would settle to, they are above that level?

A. Somewhat, yes. If debris settles in there, it will settle at the bottom, but usually on one side. It will either fall out -- if water is coming around, it will either fall out of one side or the other and maybe both where the flow is changing direction. But, yes, not exactly on the bottom to answer your question.

Q. Okay. Were you aware that this is a system that involved an inlet and then cooling water running through three units, three air-conditioning units?

A. I don't remember if I was told beforehand about that. I've read the Wards report. It's hard for me to reconstruct what I knew at the time. So I don't remember if I knew that there were

three other units or just that there were other units or whether this was the only unit.

Q. Okay. Was it your assumption in making the observations that you made that there were periods of time where the system was turned off or where otherwise cooling water was not running through the system?

A. I don't think I considered whether that would be necessary or not. I mean, I don't remember thinking about that, off/on versus always on. I don't remember.

Q. Did you have an understanding of where this particular unit was located in the system in relation to the pump that brought the water in and ran it through the piping system?

A. No.

Q. Did you have any understanding of the pressure, the water pressure that was running through the system in the area where these holes were formed?

A. The water pressure or the flow rate?

Q. The flow rate.

A. The flow rate -- because we see loose debris accumulated in the coil, and adhered to the

coil, a very friable, sandy material, also some grass, the flow rate can't be very high. So I have a general feeling for the flow rate present in the coil, at least at some time prior to sectioning of the coil. There had to be a flow rate low enough that a piece of material that looks like a blade of grass would catch and sit there.

If you have a very high flow rate, normally it will carry material through a coil. It won't let it settle out.

Q. Is it possible that material that was left in the system after the last running of that system -- meaning probably the 30th of September when there was testing done to locate the leak in a boat yard -- is it possible that some sort of material could have come into the system at that point in time and when it sat there until over a month later could have been then lodged in the system when you did your testing?

A. I mean, I suppose it's possible. I think it would be fairly sloppy practice to do your testing with dirty water, with sediment and sand and things like that in it, but it's possible.

Q. Okay. You haven't been to the boat yard or seen where the boat was being -- I say tested, not for metallurgical purposes, but to identify the location of the leak?
A. No, I haven't. Although, we have a photo in the Techton report showing the water going in the bucket looks clean, clear water. That testing doesn't look like it was done with seawater or anything like that that would have grass and things like that in it, but I haven't been to the facility.
Q. Okay. I'm going to move on to the second page. You state here, "An examination of the holes in the coil indicated that the holes in the inner cupronickel coil are sharp edged, that they occur adjacent to the helical cavity formed by the crimped configuration of the inner tubing, and that they are oblong with their long axis aligned with the crimping."
I want to go through this step by step. The first observation in this sentence says that, "The holes in the inner cupronickel coil are sharp edged." How did you determine that?

A. Visually with a stereo microscope. I mean, an optical microscope. I looked at it with my eyes.

Q. Does the fact that they were sharp edged have any meaning to you as a metallurgist?

A. It can, yes. In this case it does. So we have different modes of corrosion that occur. So there are some modes of corrosion where you get a small pit that forms, and then penetrates through a wall and the edges of the hole are normally fairly straight sided.

What I'm referring to here is that these holes appear to come from a shallow penetration in the tubing resulting in sharp edges around the holes and not straight sides.

Q. Did you do any further testing to identify what would cause that shallow penetration?

A. Not testing, no. We didn't go and try to duplicate it. When you -- so if we have some kinds of pitting corrosion, we will have the straight sides like I said. When we have erosion corrosion, which would be a possible mechanism in a tubing failure when you have high flow rates, you can get a corrosion mechanism

erosion corrosion.

Q. Can you explain exactly what that is?

A. Sure. So erosion corrosion or impingement attack is sometimes how it's referred to in the marine industry and other industries is where you have a high velocity flow of water.

Some metals are corrosion resistant because they form a nice, adherent oxide. It doesn't wash away. Chromium is like this. The reason why we chrome plate bumpers is it creates a very thin chromium oxide layer. It doesn't wash away and the chrome stays bright and shiny looking for a long time.

With copper, we form some complex oxides and hydroxides on the surface, and they're fairly soft. So what can happen is if flow rates are too high, it will erode those soft deposits that are protecting the underlying copper from the fluid, and you'll get attack in those area where flow is high.

When that happens, you get a very characteristic form of damage where you get usually horseshoe-shaped pits and a stippled or rippled surface. So you don't get a broad,

shallow, knife-edged hole. You get attack where the corroded surface will be bumpy and irregular. I see that commonly. It's quite common in modern, recirculating hot systems in wealthier homes. People like their hot water to come on very quickly, so they'll install a pump to circulate the hot water so when you turn on the tap, you get hot water right away so you can take your shower without having to wait for it.

If you make the pump too big, you'll get this erosion corrosion phenomenon at the fittings and wherever the flow becomes turbulent it's called and you'll get this rippled, very characteristic appearance.

So when we see a hole like this, it's doesn't have that appearance. It's broad and shallow with nice, uniformed sharp edges. That tells us that it's not that corrosion mechanism. It's something else.

Q. You mentioned earlier that the light wasn't sufficient for you to take photographs of the analysis of that interior tubing, correct?

A. At the time our camera on our microscope did not capture a lot of light, but I have some

photographs in here that show you those. So photograph 48, page 6 of 12.

What you have there is a photograph taken with my camera with a light shining through an outside hole, and then through the inside hole. You can see this elongated, this long pit, this long hole on the inside. If you blow the original quality photo up, I think you can even see that the edges are sharp in that photo. But it was very difficult to capture a photo. Your eye is more sensitive than my camera.

With my stereo microscope, I'm able to go in there and look at it and see that the edges of that hole are sharp. Now I think I've shipped those parts to somebody else at direction of counsel by now, so somebody else has them.

Q. They're being held by my experts.

A. They can look at that and make their own interpretation and maybe take a better photo than I could at the time. I could take a better photo now. I have better equipment.

Q. Is this an example of the kind of thing that if

you did destructive testing, you would have a better opportunity of visualizing and knowing for sure?
A. Oh, I know for sure, but you could prepare an exhibit better for someone else.
Q. Okay. I'm not doubting what you're telling me you saw, but when I look at this, I see a very dark area and I'm not sure that I could tell whether there is a rippled surface that's characteristic of something looking at this or not.
A. I understand your point, but you don't have the stereo microscope and you're looking at a small photo.
Q. True.
A. If we had the tubing here, I could explain it to you and show it to you from the end of the tubing.
Q. Are these photographs maintained in some sort of fashion by you in a way that they could be blown up?
A. Yes. I have Digital versions of the photographs.
Q. Okay.

A. I'm not sure even in the blowup -- like I said, my microscope at the time -- I have a better microscope now and a better camera on my microscope now, and I could probably capture a better photo. But you can see it by eye very well.

Q. And that would be based on your recollection of what you looked at at the time of the inspection?

A. And what I recorded in my report, yes, that's right.

Q. Okay.

A. I'll also point out that that's consistent with the presence of this layer of light, friable debris that breaks up very easily on the inside of the tubing, this and soil-like debris that's present.

It's consistent with a low flow rate, and that's consistent with crevice corrosion, which was my interpretation and not consistent with erosion corrosion, which was one of the candidates that we thought about at the time of this investigation. That is something you think about in tubing failures.

Q. Okay. Now, you state that "these holes occur adjacent to the helical cavity formed by the crimped configuration of the inner tubing."
I just want to translate that into language that regular people will understand. When you're referring to that helical cavity, is that the space that the coolant runs through?
A. No. What I'm referring to when I say adjacent to the helical cavity, the inner tube is crimped to provide more heat exchange area and -- let me show you a picture, reference a picture so it's easier to understand.
Let's just go from picture 16 since it's the first one I found. So in there, what I was referring to the helical cavity are these little pockets that extend from the interior, which would be carrying water. So that helical cavity would be full of water and not coolant. The coolant would be on the outside of that tube.
Q. Okay. Now, those little pockets, as we'll call them, allow it to have a larger surface area?
A. That's right, yes. There may also be other reasons that the manufacture puts them in there

for ease of assembly. But one of the major reasons in a heat exchanger, we want to make it so we have more contact between the two fluids that are exchanging heat. So we like to put in shapes or fins or things that increase that contact. When I say "we," it's not the royal "we." It's the engineering industry.

Q. Okay. And then you said that they, meaning the holes, are oblong with their long axis aligned with the crimping.

When you say "the crimping," I'm going to refer to this Exhibit 16 again. Are you referring to those, what looks like pinched areas?

A. Yes. Those pinched areas spiral down the tube. So those are the helical cavities, and the hole is parallel to that cavity. Those sharp-edged holes are parallel to that cavity.

Q. Okay. When you say parallel to it, the holes would be -- the holes are in the inner surface. Are they actually on that part that forms the pinched area or are they on the part that doesn't?

A. The part that doesn't.

Q. Okay. So they're not in those smaller -- I won't call them smaller tubes because they're not separate, but smaller compartments, correct?

A. That's correct. They're just outside that. That's very characteristic for these alloys and doesn't occur in most other things.

Q. What do you mean it's characteristic for these alloys?

A. In cupronickel alloys when you have crevice corrosion, the crevice is what we say more noble or -- the crevice becomes more corrosion resistant and the material next to it becomes less corrosion resistant. In most other materials like in steels, if we have a little crevice or a little pocket like that, it will corrode in the pocket due to crevice corrosion.

In cupronickel alloys, the theoretical explanation for it is the fluid in that little helical cavity, the water, has more copper ions in it and it becomes enabled or more corrosion resistant. And so the metal next to it acts as what we call protective anoid. You perform a corrosion couple where the metal next to it gets eaten away and protects the cavity.

Q. Okay. But when this is manufactured, it's all the same metal, correct, the inner tube?
A. Yes, it is.
Q. So you're saying a part of the inner tube becomes more susceptible?
A. To corrosion.
Q. To crevice corrosion?
A. Yes. The part that isn't the crevice becomes more susceptible due to this effect. So it's crevice corrosion, but the corrosion actually occurs adjacent to the crevice.
Q. Okay. Are you aware of the age of the vessel that this incident occurred in?
A. No.
Q. Would you be surprised if I told you it was a six-year-old air-conditioning unit?
A. No.
Q. Is this a common failure of a six-year-old air-conditioning units?
A. I don't think -- I'm not familiar with any common failures of six-year-old air-conditioner units. Usually if we have a design problem, we'll see it very quickly. And for a general corrosion problem, we'll see it when they're

quite old or if they're not run properly or there are other issues. This is something that occurs over time. You know, taking six years to occur is not too surprising.

It will also start occurring as debris builds up in the system. Probably due to either restrictions in flow, if there are restrictions in flow, or maybe it's just got low flow to start. It takes time, and six years is not an unreasonable amount of time for it to occur.

Q. Are you aware of whether there were any tests done on this vessel to determine if there were restrictions in flow in the system?

A. I think -- I'd have to look at the Wards report. Do you mind if I look at those reports for a second and see?

Q. I'd like to clarify, though, for the record, that the Wards report, am I correct, is it something that you did not receive until long after you wrote your opinion in this case?

A. That is correct. So I'd have to look at the Techton and Wards reports to see whether I knew it at the time.

Q. And right now what I'm talking about is the

information that you had when you rendered your opinion in December of 2010. Were you aware when you rendered your opinion whether there had been any determination of whether there was a restriction in flow or other reason that there would be a low flow in the system?
A. All I'm saying is I'd have to refresh my memory. It's been a long time.
Q. Go ahead. I wanted to make sure we didn't have any confusion about what the Wards report was and when.
A. I understand. If I learned it from the Wards report, because I have this feeling that I do know that now, then it would be after. If it's from the Techton report, it would be from before. And I'm not even sure I remember that.
Q. Okay. Take your time.
A. I don't see it in the Techton report. I actually don't see anything like that in the Wards report. This would have been after the time of my report. The AEGI report indicates that there was an entry in the maintenance logs saying that, "The seawater cooling system had -- Precision Marine had acid flushed all A/C coils

and cleaned units, and on June 2, 2010 cleaned strainers and A/C filters and ran engines for one hour."

That might be what I was remembering later or remembering now as saying that the strainers were clean or whatever. I have this recollection that at some point somebody said the strainers were clean, but it might just be this. I don't recall anything more definite than that.

Q. What relevance would clean strainers have to whether the flow was impacted?

A. Well, if after the event they had found the strainers blocked or occluded by debris, that would explain a low flow rate. So if they weren't, then you don't have a reason, necessarily, to expect a low flow rate.

You still have the evidence of it in the debris that's present in the coil, which indicates that there was a low flow rate, but we don't know why from what I looked at, which is just the little coil.

Q. Okay. So you're making an assumption based on having found some organic material debris that

there was a low flow rate, correct?

A. It's not an assumption. I'm concluding based on my interpretation of the presence of the debris, including the fine, friable sandy debris that's adhered to the wall and the organic, leafy debris, that there must have been a low flow rate in that coil at some point. That would be consistent with that.

Q. When you say "fine, friable sandy debris," I want to get a better understanding of what exactly you mean by that.

A. Okay. If you look in my photos again. Let's look at photo 90, which is an SEM scanning electron microscope photograph.

Q. Okay. Yes, I see.

A. Do you see that coding, I'll call it, that's peeled up, the black stuff that is curling in that photo? It's hard to interpret if you're not used to these.

Q. I was just going to say not really. I guess I see here, is this an edge and this is you're seeing through to another layer?

A. This is the inside of the tubing. The white stuff that you're seeing -- in a scanning

electron microscope, we have no color. So what you see are light elements or dark. This is a back scatter photo if I'm not mistaken. Yes, it's a back scatter photo.

The light elements are dark and the heavy elements, which is the copper and nickel are light. So this is where this coding which is a fine, sandy -- like a dried-on dirt kind of coating, it flakes off very readily when you're handling it. It's peeling up here. In the bag with this were a quantity of this fine, sandy soil-like debris. Actually a small, a couple of little seashell kind of things I think, if I'm remembering this case correctly, and some other debris, some little sandy stuff in the bag.

But it's also adhered to the inside of the tubing, and that's what you're seeing there is that little fine layer. It's really flaky and dry.

Q. Now, did you test that layer to identify what it is?

A. I believe so. I think I reference that in my report where I say, "It contains significant amounts of copper, carbon, oxygen, nickel,

calcium, nickel. It looks like I listed nickel twice. Iron, chlorine, silicon and magnesium.
Q. Where did you say that?
A. It's in the middle of the second paragraph on page 2.
Q. Okay.
A. It says, "This composition is consistent with a mixture of corrosion products or scale." Scale is just another metallurgical term for corrosion products.
Q. All right.
A. And marine debris.
Q. Okay. Let me ask you a question that has more to do with general marine maintenance procedures. You mentioned that you had seen something about acid cleaning in the AEGI report, correct?
A. Correct.
Q. What is your understanding about when there is acid cleaning done in a marine air-conditioning system? What does it do and why do you do it and when do you do it?
A. I don't know exactly when you would do it. You do acid cleaning in a lot of piping systems, and

you do it usually to dissolve deposits that are soluble in your acid. So in a case like this, you worry about getting magnesium and calcium carbonates and things that can precipitate out of seawater, and you might want to clean those off in your heat exchanger and clean away other -- kill bacteria. You can use those kinds of treatments to do certain kinds of things to clean your tubing in lots of heat exchangers.

Now, specifically to marine air-conditioning units, I haven't looked at a lot of those, as we talked about earlier, so I don't know specifically what the criteria are for doing the acid cleaning.

Q. Do you have an understanding of whether it would be expected to have some level of marine life, I'll call it, inside the system beyond the strainer in the cooling coils?

A. It would certainly be possible that you could have some marine life in there if flow rates are low enough and it could stick to the sides.

Q. Is it your understanding that it's a rather normal or unusual circumstance to have some level of marine biological material inside the

cooling coils of a marine air-conditioning system?

A. I don't know specific to marine air-conditioning systems, but I know that fouling is an issue of all kinds of seawater piping, all kinds of raw water piping.

Q. When you say "fouling," what do you mean by that?

A. I mean living things wanting to grow inside your pipe.

Q. Okay. So do you have any understanding of whether the material that you found present and tested and you've described here in this paragraph, is what you would expect to see in a marine air system that hasn't had its cooling coils cleaned since, what is it, about eight months earlier?

A. I'm not surprised by the elements present just being in a marine system. I don't have a feel for how quickly such material accumulates in typical service.

Q. Okay.

A. I will say that grass -- I don't expect grass in a system with strainers or big organic debris

like that.
Q. I'll move down to your analysis. Your first conclusion, I'll call it, is that "the holes in the inner cupronickel," and when you say that, you mean the part of the compartment that held the seawater, correct, the part on the inside?
A. Yes.
Q. The holes in that part of the tubing were the ones in your opinion that occurred first, correct?
A. I believe that's the most likely scenario, correct, yes.
Q. You then say -- and I'm just going to go to the last sentence of that paragraph. "Additionally, once seawater is present between the inner cupronickel tubing and the outer copper tubing, a galvanic couple is formed which would have preferentially corroded the outer tubing reducing the corrosion rate in the inner cupronickel tubing and forming the holes which allowed seawater to leak from the coil."
A. Yes.
Q. Can you explain what you mean by "galvanic couple being formed"?

A. Yes. I'll do my best to explain it. It's not a terribly complicated concept, but I may not be the best explainer. So there is a series of the corrosion activity of elements we call the galvanic series.

So if we have an electrolyte in seawater, seawater is an electrolyte that's a conductive fluid. If we have two metals that are in electrical contact with each other and one is more noble, more corrosion resistant than the other, then what happens is the one that is less corrosion resistant gets eaten. It's the anode.

And the one that's more corrosion resistant is protected. It's the cathode. And we use this property by putting anodes in a lot of our marine systems. The anodes are sacrificial anodes. There's zinc. There's zinc aluminum or zinc magnesium or zinc aluminum magnesium. Alloys that are very easily corroded, and by corroding they protect the metal that they're attached to.

In this case, copper is less noble than cupronickel. And so once we have seawater

between the two, the outside copper shell will be a protective anode for the cupronickel tubing. It will protect it from corrosion.

Q. Okay. So the copper on the outside becomes a sacrificial anode?

A. Yes.

Q. Is that correct?

A. Yes.

Q. Okay. Because it's less noble than the cupronickel?

A. Yes.

Q. And for that to happen, does there -- you said that salt water is an electrolyte. Does there need to be an electricity present for that happen?

A. No.

Q. How does it happen?

A. It happens the same way if you sit a boat in the water with anodes on the outside. The anodes will corrode away. You don't have to apply any external electricity. There is a charge difference present. There are electrons that move around, but they're generated from that corrosion reaction.

It's like making a potato battery if you've ever done that as a kid. You stick two pieces of metal in the potato and it's the electrolyte, and you generate a current. you generate the flow of electrons through the corrosion of the materials.

So when this happens, they have to be electrically connected. The metal has to be in contact so that the electrons can flow, but you don't need any external electricity if that's what you mean.

Q. Okay. Is it fair to say that what you're referring to as galvanic couple describes electrolytic corrosion?

A. Yes, or galvanic corrosion. You can use a bunch of different terms for that.

Q. So you basically -- you've got a hole in the middle in the inside tube. Your theory is that because that hole happened, once seawater got into the center part of the tube, the outer part that has the coolant in it --

A. Should have had the coolant in it, yes.

Q. At that point it's your theory that that would have caused galvanic or electrolytic corrosion

to put a hole in the outer tube?

A. Right.

Q. Okay. And once that hole in the outer tube happened, then the water would be able to flow to the outside?

A. Right.

Q. Okay.

A. Now, there may have also been corrosion in that copper tube. Corrosion effects are additive, right? So I think the galvanic couple here is the dominant factor. But anything else that's going to accelerate corrosion will speed up that corrosion of the outer tube.

Q. Okay. Let me ask you on the -- you mentioned -- I want to go back to that inner tube again because I think at least based on your theory, that really was the first failure. That's initially where the inner tube failed?

A. Right.

Q. And you've referred to this crevice corrosion?

A. Yes.

Q. Is crevice corrosion a mechanical erosion of the material due to whatever the debris did blocking the flow rate?

A. No.
Q. What is it?
A. It's dissolution of the material through a normal corrosion reaction. Erosion corrosion is mechanical removal of the oxide layer. The corrosion product, the scale.
In a crevice corrosion case, you're having dissolution of the metal. The ions go into the water and are gone.
Q. Okay. I guess what I'm failing to understand is why would that happen? What causes the ions to go into the water when you have crevice corrosion?
A. It happens whenever you have corrosion. Metal ions get pulled off and go away or react and form oxides or form scale.
Q. Okay.
A. But it's the natural corrosion that happens, and it happens because we formed an anode just like we put the zinc anodes on our boat hull or in our piping system. That anode that we formed, because we've made a local cathode in the crevice, that anode corrodes away just like our zincs do in our system, and it's providing a

source of electrons that protect the cathode.

Q. Okay. And why does this not happen throughout the cooling system?

A. It normally happens where the water is stagnant. So the water sitting there where you would have debris block off those channels so there is not good exchange. They're not flushed by the water and the cooling system, which is why it would occur where it did, which is near the bottom of the coil, which is not -- you know if we have -- that's another thing.

When we're looking at that versus erosion corrosion, we expect erosion corrosion to happen where we have a change in diameter or significant interruption in flow to generate that turbulent flow to eat through it. That normally doesn't happen in the middle of a coil that's fairly symmetrical.

Q. You mentioned a blade of grass. Did you actually find grass?

A. I found a piece of organic debris that when I poked it with a small manipulator to feel its texture, it felt flexible and it looks like a blade of grass. Now, I wouldn't say real grass,

but some kind of organic plant life, you know, something from the water, I assume. But there is a -- I'll show you a photo. It's easier.

I shouldn't call it a blade of grass because I'm pretty sure it's not actual grass, but in photo 86 --

Q. Okay. So we're on page 11?
A. Page 11 of 12, photo 86. And actually the one before it.
Q. I see 86 and 85?
A. Yes. That material that's there inside the tubing when you prod it with a little manipulator, which is like a -- I don't know what they call it. I say manipulator. A little blunt needle is what I used like you would use in dissection in high school. When you prod it, it's a flexible, tough piece of material.
Q. Did you pull it out to inspect it further?
A. No.
Q. So it would probably still be in there?
A. It should be unless it's been handled roughly.
Q. Or dried out?
A. Further. It was pretty dry at the time.
Q. Okay. Did it seem to be stuck and jammed in

there from your manipulation of it when you prodded it?

A. It's very thin and lightweight in this condition, which is dried out. I did not try to dislodge it. I did not want to spoiliate the evidence. I didn't want to change its condition.

Incidentally, on that same page in photos 81 and 82, that's some of the other debris and some of that's coarse that was in the bag with this coil.

Q. Okay. Is it possible that debris -- I'm going to reference and go back to the pictures from Techton's report when they were removing those coils. Is it possible that debris which looks kind of like rust could have come off the box itself or the outside of the coils where they were in contact with the box?

A. Some of it may be. It could be rust. Some of it -- I mean, the photo may be it -- looks reddish, but some of it is really light brown in color, not consistent with rust typically, which ranges from kind of a light orange to a dark brown, dark red, brown.

There is also -- if you look in photo 79, there is a little thing that looks like a little seashell, and that could be on the outside. It could have been on the outside of the coil, I suppose or otherwise introduced.
Q. Okay.
A. This was all sent to us in the coil, and all we got was the coil.
Q. Right. So was this envelope that you see in the picture in 79, was there originally tubing in with that or was that just by itself?
A. That's a fresh plastic bag that I put all of the debris that was from this blue plastic bag. It was shipped in this large Ziploc, the coil was.
Q. The whole thing?
A. The several pieces, yes.
Q. The several pieces, they were not separated when they were sent to you; is that correct?
A. I believe that's correct.
Q. So it was all in one bag?
A. I believe that's correct if my recollection is correct.
Q. Okay. So in the bottom of that bag when you took out the coil, you found this powder-like,

flaky substance?
A. Yes. More of it fell out of the coil as I'm examining it. You know, a little bit would fall out as you move it around.
Q. Okay. When you received the coil, had it been cleaned on the outside?
A. It was in the condition that you see in photo 6, which is to say there are deposits on the outside, but no coarse dirt or material that really looks like what's in the bottom of the bag.
Q. Okay. I just want to make sure that I have a couple of things clear for the record. Is it fair to say that you did not, as part of your analysis, measure or calculate the flow rate of the system?
A. That's correct.
Q. And is it fair to say that you didn't measure or calculate the flow rate through the holes that were formed in the system?
A. That's correct.
Q. Okay. Did you do anything to measure or calculate the water pressure that existed in that portion of tubing where the holes formed?

A. I did no calculation to assess water pressure or flow rate.
Q. Of any kind?
A. Of any kind.
Q. Okay. Did you do any kind of determination to figure out what the volume of water was that would have come through the holes?
A. No, I did not.
Q. Okay. What would you have to do to eliminate the possibility of what you've referred to as erosion corrosion or impingement attack?
A. Where we see the damage and the appearance of the damage are not consistent with erosion corrosion. So I don't think you need to do anything else to eliminate that.
Q. Okay. That's based upon your visualization of an area that, at least at the time when you took the sample, you didn't have sufficient light to take the photograph that saw what your eyes saw?
A. That's right. That's an examination of that part. Also, the holes do not occur at the inlet or outlet of the tubing or where there is a change in the inside diameter of the tubing. So

if we had an erosion corrosion issue just purely due to flow rate, it would occur where we have a change in diameter or a change in the configuration of the tube. That is, we'd expect to see it at the crimped portion of the coil or near the inlet or outlet where it goes to an uncrimped portion of cupronickel tubing, and we don't see it there. It doesn't occur there.

So if we had an erosion corrosion issue, it always occurs in those areas where you have a change, where you have a geometric change or a change in flow direction or an expansion of the tubing or something like that. It doesn't occur in the middle of something that's a relatively uniform geometry.

Q. Could it happen in a piece of debris like you showed me in the photographs?

A. If you had high enough flow rates to cause erosion corrosion, you shouldn't have loose debris like that. You would need something hard to stand up to it.

Q. Okay. I think we've established there wasn't anything done to eliminate the possibility -- or you're not aware of anything -- of organic

matter being brought into the system subsequent to the sinking of the vessel during the time the surveyors were trying to find the leak, for instance, or sometime after that and before the tubing got to you?

A. I'm not aware of the details of what water they used or how they did that testing other than what is present from the Techton reports which don't describe that in detail.

Q. Okay.

MS. NIEMEYER: I'd like to take a short break and look at this file just to see if there is anything else I should be asking based on the things that I didn't have.

MR. GOLDMAN: That's fine.

(Brief break taken.)

BY MS. NIEMEYER:

Q. I'm just going to identify the letter that you just looked at. There was a letter dated May 6, 2013 in this packet, which is marked as Composite Exhibit 14.

Can you describe for the record again what that letter is?

A. I believe it's a transmittal letter when I sent

a DVD containing my photographs to Mr. Goldman.
Q. Okay. And then the other document that I showed you, can you describe what that is?
A. This contains the two e-mails, I believe we referenced earlier in our conversation today, which talk about my examination of the coil.
Q. Okay. Subsequent to your providing your written opinion in December of 2010, were you asked to provide any additional written opinions related to this case?
A. I was asked to review the Wards and AEGI reports and to provide comment, which I did in an e-mail. So I was not asked to prepare a formal report, but to provide some comments.
Q. Is that e-mail contained in the file that you brought to me?
A. I'm pretty sure it is. I had it printed today because I knew it might be of interest.
MR. GOLDMAN: It is.
MS. NIEMEYER: I didn't see it.
MR. GOLDMAN: It's right there.
A. It's this one. It should be at the top of your document.
Q. Okay.

A. There, it's stapled to the back of the AEGI report. So when they copied my file, they just accidentally stapled it together.

Q. Okay. Let me just take a look at that because I was not aware when I glossed over the AEGI report.

The copy that I have here has page 1 of this. Do you have three pages because I see page 1 and a page 3.

A. Did they not give you the page 2?

Q. I don't have page 2 unless it's mixed up. No, I don't have page 2. Why don't we just take that whole document and we'll copy that separately.

(E-Mail received and marked for identification as Exhibit No. 17.)

MS. NIEMEYER: Okay. I just -- I'll note for the record that while we were off the record, we took an exhibit, which has been marked as Exhibit 17.

That is an e-mail communication between Mr. Biery and Mr. Goldman, it appears, explaining his analysis or his conclusions after having read the reports of Wards Marine Electric and AEGI.

BY MS. NIEMEYER:
Q. Am I correctly describing that document?
A. Yes, you are.
MS. NIEMEYER: And just for the record, the copy that's being attached to the transcript is a two-sided copy. So when people are copying it later, be careful to get both sides.
BY MS. NIEMEYER:
Q. Does this document fully describe your conclusions after you read the Wards Marine Electric and AEGI reports?
A. This document is my comments on those. I don't believe I phrased it as conclusions. They were just my thoughts, okay. I haven't formalized final opinions. These are the things that I noted when going through it.
Q. Okay.
A. It's all of the thoughts or conclusions that I have at this time.
Q. Okay. For you to formalize your opinion, would you need to do anything else?
A. No. All I'm saying is I may have -- I don't recall the day when I did this, so I may have been going fairly quickly through those reports,

and I might have other thoughts that would occur to me if I read them again. That's all I'm saying.

Q. Okay. Based on as you sit here today, is there further work that you believe you would need to do to give a formal, final report after having read those two reports?

A. No, although part of what this does is say we could do additional work if requested. So that's not a conclusion.

Q. Okay. Was it requested of you at any time to do that additional work that you mentioned you might be able to do?

A. No.

Q. Okay. Did the information provided in the Wards Marine Electric or the AEGI report cause you to change any of your opinions that were reflected previously in the written report we discussed at length?

A. No.

MS. NIEMEYER: No further questions.

MR. GOLDMAN: He waives.

(The deposition concluded at 3:30 p.m.)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Tara L. Wosny, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that Nicholas E. Biery, Ph.D., P.E., the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record, to the best of my ability, of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 27th day of November, 2014.

Tara L. Wosny
Notary Public
My commission expires:
June 10, 2015