UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IAG LLC,

    Plaintiff,

v.   Case No: 8:13-cv-1675-T-36TBM

NATIONAL UNION FIRE INSURANCE
CO. OF PITTSBURGH PENNSYLVANIA,

    Defendant.
_____/

## **ORDER**

This matter comes before the Court upon Defendant's Motion for Summary Judgment (Doc. 50), Plaintiff's response thereto (Doc. 73), Defendant's reply (Doc. 77), Plaintiff's Motion for Summary Judgment (Doc. 51), Defendant's response thereto (Doc. 71), and Plaintiff's reply (Doc. 74). Oral argument on the motions for summary judgment was held on May 6, 2015 (Doc. 93). Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 50) will be denied and Plaintiff's Motion for Summary Judgment (Doc. 51) will be granted in part and denied in part.

**I.    STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

For purposes of summary judgment only, the following facts are undisputed.

    a. In May of 2010, Defendant National Union Fire Insurance Co. of Pittsburgh Pennsylvania ("National Union") issued a maritime insurance policy (No. 051763302) to Plaintiff IAG, LLC ("IAG"). Doc. 50 at p. 2; Doc. 50-1.

---

[1] The Court presents the facts in the light most favorable to the non-moving party based on the parties' submissions, affidavits, and deposition testimony, as required by Fed. R. Civ. P. 56.

b. The policy was an "all risks" policy which provided $1,000,000.00 in first-party property damage coverage for "accidental, direct physical loss or damage, except as specifically excluded in this policy" to the 2004 Carver Marquis vessel named *It's All Good.* Doc. 50 at p. 2; Doc. 50-1.

c. The *It's All Good* is owned by the Plaintiff, IAG. Doc. 53 at 18:14-19.

d. Howard Paul Becker ("Becker") is the owner of IAG. Doc. 53 at 9:4-24.

e. Captain Marty Ebding was employed as the skipper of the *It's All Good*. Becker Depo. at 18:25-19:16.

f. On August 13, 2010, the *It's All Good,* a six year old vessel, partially sank while docked in St. Petersburg, Florida. Doc. 50 at p. 3; Doc. 73 at p. 2.

g. On September 17, 2010, the vessel was inspected by Sam Techton, who was retained by National Union. *See* Doc. 50-4.

h. On September 30, 2010, the vessel was examined again by Techton and a marine surveyor retained by IAG named Duane Ives. *See* Doc. 50-5.

i. The air conditioning cooling coil was removed from the vessel and then inspected by Nicholas Biery. Doc. 73 at p. 4.

j. National Union declined coverage of the damage due to exclusions in the policy for damage caused by wear and tear, corrosion, gradual deterioration, or weathering. Doc. 50 at p. 2-3.

k. In 2013, IAG had the evidence examined by three additional experts: Peter Layson, Orion Keifer, and Steve Hebert.

l. Water entered the vessel through holes in the inner cupronickel tubing of the vessel's air conditioning coil. Doc. 50 at p. 1; Doc. 73 at p. 2.

    m. The likely cause of the penetrations in the inner tube is erosion/impingement attack. Doc. 77 at pp. 2-3; Doc. 73 at pp. 6-7.

    n. The water then escaped through holes in the outer copper tubing of the cooling coil. Doc. 50 at p. 1; Doc. 73 at p. 3.

    o. The holes in the outer tubing of the air conditioning coil were caused by erosion. Doc. 50 at p. 6.

    p. The vessel's bilge pump capacity was adequate to keep the vessel afloat. Doc. 71 at p. 5; Doc. 73 at p. 3.

    q. At some point, there was an interruption of shoreside electricity to the vessel. Doc. 50 at p. 1; Doc. 73 at p. 7.

    r. The vessel's bilge pumps eventually failed due to depletion of the vessel's batteries. Doc. 71 at p. 5; Doc. 73 at p. 7.

    s. The vessel would not have sunk but for the failure of the bilge pumps to remove water from the vessel. Doc. 50 at p. 7, Doc. 73 at p. 7.

## II. The Experts

### A. Sam Techton

In his original report, dated September 17, 2010, Techton explained the "cause of loss" as follows:

> The Cruisair SXF5/1-RMT evaporator cooling coils experienced salt water corrosion over time. The raw water circuit for the air conditioners uses a 4700 gallon per hour Scott pump #6078. The raw water from the pump leaked out of the evaporator cooling coils into the pan below the unit. The pan overflowed into the bilge. The 2000 gallon per hour bilge pump could not keep up with the water incursion. As the vessel took on more water it possibly filled up with additional water through the Glenn Dinning access portals on the port side of the swim platform and into bilge area.

Doc. 50-4 at p. 3. On September 30, 2010, Techton issued a second report which stated that "[t]he

leak to the coils suggests that there was galvanic corrosion between the side of the evaporator and the copper evaporator coil." Doc. 50-5 at p. 3. On October 14, 2010, Techton issued another report following a test of the bilge pump. *See* Doc. 50-8. Based on these tests, Techton determined that the bilge pump was operable and that water had likely spilled into the bilge compartment at a rate of 600 gallons per hour – a drastically different estimate than in his original report. Doc. 50-8 at p. 1.  This report concluded that the inner copper coil corroded causing the raw water leak. Doc. 50-8 at p. 2. This raw water leak led to the corrosion of the outside copper coil, aluminum shroud, and heat sink fins. Doc. 50-8 at p. 2. Techton defines "corrosion" as the "deterioration of metal." Doc. 50-10 at 14:4-8. Techton appears to use the terms erosion and corrosion interchangeably. Doc. 50-10 at 14:4 – 15:11.

### B.  Duane "Dewey" Ives

Ives is an accredited marine surveyor who works in three different disciplines: Pre-purchase surveys, insurance risk surveys, and damage claims. Doc. 54 at 6:24 – 7:7, 12:19-22. Ives has been doing insurance claims work since 1989, determining the causes and value of losses. Doc. 54 at 7:8-19. However, he has never been retained as an expert witness or testified in court. Doc. 54 at 8:23 – 9:8. Here, he was hired as a consultant by Becker. Doc. 54 at 9:10-21.

Ives produced two consultation reports regarding the partial submersion of the *It's All Good*, one on October 4, 2010 and another on October 19, 2010. Doc. 54 at 9:16 – 10:19. The October 4th report was based on Ives' inspection of the ship on September 30, 2010. Doc. 54 at 20:17-20. Techton showed Ives the air conditioning unit, identifying it as the source of the leak. Doc. 54 at 21:2-7. Ives noticed a level of corrosion on the air intake screen "consistent with the level of water believed to be in the . . . condensing tray." Doc. 54 at 21:17-21. Ives observed that, when the seawater pump was activated, water could be seen leaking from the evaporator/fan tray.

Doc. 54 at 22:25 – 23:8, 24:23 – 25:1. Ives inspected the seawater feed and discharge fittings and observed no leaks. Doc. 54 at 25:2-3. Thus, Ives concluded that the leak had to be inside the evaporator/condenser/fan compartment of the unit. Doc. 54 at 25:9-12. Ives had a technician open up the unit so he could see inside. Doc. 54 at 25:13-19. This was the first time Ives had looked inside one of these units. Doc. 54 at 26:16-17. Ives observed water "profusely flowing from the condenser coil." Doc. 54 at 25:24 – 26:1; Doc. 54-1 at p. 3. Ives also observed significant corrosion "where the copper alloy tubes of the condenser coils were lying directly against the aluminum condenser/evaporator/fan compartment casing." Doc. 54 at 26:25 – 27:4; Doc. 54-1 at p. 3. Ives indicated that the source of the most severe leak were holes in the condenser coil which had been corroded through. Doc. 54 at 27:12-24; Doc. 54-1 at pp. 3-4. Ives testified that it appeared that the condensation tray drain was not functioning properly, which allowed water to accumulate rather than drain to the sump box. Doc. 54 at 28:13-25; Doc. 54-1 at p. 4. The drain hose was not clogged. Doc. 54 at 34:7-12. However, the sump pump was not working. Doc. 54 at 29:4-21. If the pump had been working, water would not have accumulated in the tray. Doc, 54 at 31:9-15. Ives also concluded that the failure of the sump pump contributed to the corrosion of the unit because it allowed water to build-up in the fan housing. Doc. 54 at 37:4-24. Ives also concluded that at least one of the bilge pumps was not running at the time of the loss. Doc. 54 at 40:18 – 41:17.

Ives ultimately concluded that, even if the bilge pumps had been functioning, the inoperative sump box system would have led to the build-up of corrosion. Doc. 54 at 66:7-18. Ives testified that the proximate cause of the failure of the condenser core was corrosion. Doc. 54 at 72:1-12.

The pictures taken of the air conditioning unit were taken after the boat had been partially submerged on August 13, 2010. Doc. 54 at 81:1-20. Accordingly, some of the corrosion shown in

the photos could be a result of the submersion. Doc. 54 at 81:21 – 82:17. However, Ives does not believe that the holes in the coil appeared after the submersion. Doc. 54 at 82:21 – 83:1.

**C. Peter Layson**

Layson and Orion Kiefer are both principals of Applications Engineering Group, Inc. ("AEGI"). Doc. 58 at 5:14-17; Doc. 59 at 9:23 – 10:3. They both prepared a report on the *It's All Good,* dated May 28, 2014. Doc. 58 at 18:8-25; Doc. 59 at 11:14-23, 20:15 – 21:4.

Layson has a bachelor's degree in physics, with a minor in mathematics, from Jacksonville University. Doc. 59 at 7:3-9. He is the principal staff scientist at AEGI. Doc. 59 at 8:6-12. Layson works in the area of "product liability issues and electrical/mechanical issues, product failures." Doc. 59 at 8:13-18.

Layson inspected the *It's All Good* on September 5, 2013. Doc. 59 at 12:17 – 13:6. Layson concluded that the leak rate was approximately 75 gallons per hour. Doc. 59 at 26:8 – 27:1. Layson concluded that the *It's All Good* "had water infiltration into the vessel that either the pumps could not maintain or failed to maintain, and the boat sank." Doc. 59 at 28:7-10. According to Layson, the only source that had been identified for the water leak is the penetrations in the air-conditioning unit. Doc. 59 at 28:11-17. Layson also concluded that there was a loss of power or insufficient power to the bilge pumps. Doc. 59 at 28:18-23. At the time of Layson's inspection all of the pumps except the 800-gallon sump pump were functional, as were their float switches. Doc. 59 at 29:1-6. Layson does not know what condition the batteries were in at the time of the loss, but he did determine that the boat was connected to shore power at the time of the loss. Doc. 59 at 29:13-22. When Layson inspected the vessel, the selector switches for AC shore power and generator power were in the AC shore power position. Doc. 59 at 32:18-24. In order for the air conditioning to

6

pump water through the air conditioning unit it had to be connected to a power source. Doc. 59 at 30:4-7, 37:1-4.

### D. Orion Keifer

Keifer, the senior scientist at AEGI, has a bachelor's degree and a master's degree in mechanical engineering. Doc. 58 at 5:22-25, 54:8-11. Keifer also has a master's degree in biochemical trauma and expertise in metallurgy. Doc. 58 at 5:25 – 6:1, 54:12-21. Keifer was retained by the Plaintiff to "do an analysis on potential flow rates based on the configuration, to look at the flow inside this particular unit, and also to estimate the amount of water that was necessary to have the vessel go down by the stern . . . ." Doc. 58 at 26:13-18, 54:2-7.

Keifer opined that the outer holes in the air conditioning coil were the result of erosion, but could not come to a conclusion regarding the inner holes. Doc. 58 at 12:22-25. Keifer defines erosion as "the mechanical removal of material." Doc. 58 at 13:1-2. Keifer did observe some corrosion on the coil, but he could not determine whether the corrosion had any role in creating the inner holes. Doc. 58 at 15:10-15. In this instance, Keifer believes that penetration occurred in the inner tube and it caused water to spray on the outer tube, creating the outer penetration as it wore through the material. Doc. 58 at 17:14-18.

Because the holes were so small, they would not present a risk of sinking the boat as long as the bilge pumps were operational. Doc. 58 at 22:3-7. Keifer calculated an overestimate of the flow rate which indicated that, at the very most, it would be less than 15 gallons per minute. Doc. 58 at 40:8 – 41:7, 45:13 – 46:19, 54:12-19. This flow rate was substantially less than the capacity of the aft bilge pump, if it had been operating. Doc. 58 at 41:8-12. Keifer did not investigate what may have prevented the aft bilge pump from working on the date of the loss. Doc. 58 at 42:1-25.

Keifer also opined that, because of the way the boat was designed, the flow rate to the subject air conditioning unit was well above design specifications. Doc. 58 at 50:21 – 51:19. The unit was designed for a flow rate of 1.25 to 1.5 gallons per minute but the seawater pump was pushing through 7.35 gallons per minute. Doc. 58 at 53:4-11.

### E. Steve Hebert

Hebert has a bachelor's degree in psychology from the University of South Florida and has been studying electrical engineering at Florida Atlantic University since 1996. Doc. 57 at 7:5-25. He also holds a marine electrical certification from the American Boat and Yacht Counsel. Doc. 57 at 10:16-17. Hebert was employed by Ward's Marine Electric ("WME"), a company which works on yachts and boats doing electrical repairs, refits, new builds, engineering and design. Doc. 57 at 8:12 – 9:1. Hebert was employed by WME as a service manager in at least two locations over eight years. Doc. 57 at 9:7-22. He spends about ten percent of his time serving as an expert witness. Doc. 57 at 11:3-6. Hebert was retained as an expert witness by IAG in late 2013 to render an opinion as to the cause of the partial submersion of the *It's All Good*. Doc. 57 at 12:25 – 13:14, 20:7-11.

In his capacity as expert witness, Hebert conducted two inspections on September 5, 2013 and May 9, 2014. Doc. 57 at 14:7-16.

> The first inspection was our general joint inspection at which Sam Techton, I believe, was also present, and that was basic testing of the bilge pumps and other electrical systems that could have an impact on the sinking of the vessel and trying to do our own investigation into the cause of the sinking. The second visit was to collect specific information about piping diameters, links and fittings that were associated with the air conditioning system raw water cooling system.

Doc. 57 at 14:25 – 15:9.

Hebert opined that the damage to the air conditioning coil was impingement attack, which he defined as "a type of corrosion that occurs when you have very high velocity water flow or disturbed water flow through piping which can strip protective oxides that form on metals naturally in seawater. Once those protective oxides are stripped then the metal becomes much more prone to corrosion damage." Doc. 57 at 21:1-12.

According to Hebert's report, "[t]he sump pump and bilge pumping system should have been able to dewater the vessel at a sufficient rate to prevent the vessel's partial submersion indefinitely had the sump pump and bilge pumping system been fully operational." Doc. 57 at 26:21 – 27:4. The sump pump's function is to remove condensation that would normally form during operation of the air conditioning unit. Doc. 57 at 27:6-10. When Hebert inspected the sump pump it was non-functional, but he could not determine why it was non-functional or how long it had been that way. Doc. 57 at 27:11 – 28:5. Hebert guessed that the sump pump "simply wore out." Doc. 57 at 28:9-16.

In Hebert's opinion, the failure of the bilge pumping system caused the partial submersion of the *It's All Good* because "[i]t was not only the last event in time, it's the reason the boat sinks. If the bilge pump system works as it's designed to, this leak can occur, at the rate that it's been defined to have occurred both by Techton and by AEGI, indefinitely. And the bilge pumps are more than capable of removing that amount of water from the bilge." Doc. 57 at 30:4-14. Each bilge pump is on a separate branch circuit, so the only thing that would cause a global failure of the bilge pumps would be a loss of power to the entire system. Doc. 57 at 31:20 – 32:10.

According to Hebert, the bilge pumps always operate on battery power, but when the AC power source (either the generator or shore power) is interrupted, the batteries are not recharged.

9

Doc. 57 at 47:11 – 48:9. Thus, the batteries are depleted more quickly and the bilge pumps stop working. Doc. 57 at 47:11 – 48:9.

In order for the air conditioning unit to be running and pumping seawater into the vessel, the vessel had to be connected to AC power – either shore power or generator power. Doc. 57 at 63:9-11. Therefore, during any time that AC power was unavailable, the air conditioner would be off and there would not have been water actively coming on the boat. Doc. 57 at 63:16-25. Thus, "the shore power system may have had a temporary interruption over the course of which the batteries were depleted. Then when the power comes back on the [air conditioner] pump starts working immediately, but the batteries are depleted and the charger may not be able to recover the batteries quickly enough to dewater the vessel before the sinking occurs." Doc. 57 at 54:1-7, 63:4-7. In this instance, Hebert cannot determine the condition of the batteries at the time of the incident, so he does not know how long it would have taken to deplete them. Doc. 57 at 55:3-22.

### F.   Nicholas Biery, Ph.D.

Dr. Biery was retained as an expert witness to examine the air conditioning coil of the *It's All Good* and determine the cause of the holes in the inner and outer tubes. Doc. 72 at 11:9-19. Frank Micari, of Techton Marine Counseling, sent Dr. Biery the Techton reports and the air conditioning coil indicating that he was "curious as to the cause of failure of the inner and outer tubing", and that the primary elements involved were "salt water, electricity and copper tubing." Doc. 72 at 12:11 – 13:11. Dr. Biery produced a report which was reviewed by a technical reviewer named Robert S. Cabonara. Doc. 72 at 22:18 – 23:3. The material received and examined by Dr. Biery consisted of six pieces of copper and cupronickel tubing and a small quantity of loose debris. Doc. 72 at 24:1-11.

Dr. Biery noted that, adjacent to one of the holes, the outer tubing is "abraded, as if [there was] relative motion between the coil and some other piece of metal." Doc. 72 at 40:1-5. This hole would have caused a loss of freon but, according to Dr. Biery, would not have caused the inner tubing to corrode. Doc. 72 at 40:8-14.

Dr. Biery surmised that the flow rate through the coil was not very high because debris, such as a blade of grass, had settled within the tube. Doc. 72 at 49:8-20. Dr. Biery did not believe that this debris could have been introduced during the post-submersion testing because the pictures show clean, clear water. Doc. 72 at 49:21 – 50:19.

"An examination of the holes in the coil indicated that the holes in the inner cupronickel coil are sharp-edged, that they occur adjacent to the helical cavity formed by the crimped configuration of the inner tubing, and that they are oblong with their long axis aligned with the crimping." Doc. 72 at 50:21 – 51:2. The sharp edges indicated to Dr. Biery that the holes "come from a shallow penetration in the tubing resulting in sharp edges around the holes and not straight sides." Doc. 72 at 51:11-22. Dr. Biery ultimately opined that the holes were caused by crevice corrosion. Doc. 72 at 56:20-25.

**III.    Standard of Review**

Summary judgment is appropriate only when the court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits. *See* Fed. R. Civ. P. 56(a). Issues of fact are genuine only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. At the hearing in this case, Defendant noted that summary judgment is proper here because Defendant accepts Plaintiff's set of facts, requiring that only legal disputes be resolved.

**IV.    Legal Analysis**

Marine insurance policies are maritime contracts within federal admiralty jurisdiction. *Morrison Grain Co. v. Utica Mut. Ins. Soc.,* 632 F.2d 424, 428 n.4 (5th Cir. 1980) (citing *Kossick v. United Fruit Co.,* 365 U.S. 731, 735 (1961)). Nonetheless, unless there is a federally established admiralty law, i.e., an entrenched federal maritime precedent on point, state law generally applies to the interpretation of such contracts. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 320-21 (1955); *Kilpatrick Marine Piling v. Fireman's Fund. Ins. Co.,* 795 F.2d 940, 948 (11th Cir. 1986); *Aetna Ins. Co. v. Dudney,* 595 So.2d 238, 239 (Fla. 4th DCA 1992). "[W]hen neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." *All Underwriters v. Weisberg*, 222 F.3d 1309, 1312 (11th Cir. 2000) (quoting *Coastal Fuels Mktg., Inc. v. Florida Express Shipping Co.,* 207 F.3d 1247, 1251 (11th Cir. 2000)).

Most of the relevant facts here have been stipulated to by the parties. The question for the Court, therefore, is the correct interpretation or construction of the Policy, *i.e.*, does the Policy include or preclude coverage? It is axiomatic that the interpretation of the provisions of an

insurance contract is a matter of law to be decided by the court. *Adelberg v. Berkshire Life Ins. Co.*, 97 F.3d 470, 472 (11th Cir. 1996)

Here, the Policy at issue is an "all-risk" policy of marine insurance. An all risk policy "provides coverage against all risks . . . covering every loss that may happen except by the fraudulent acts of the insured." *LaMadrid v. Nat'l Union Fire Ins. Co.*, 567 Fed. Appx 695, 700 (11th Cir. 2014) (internal citations omitted). It provides coverage for risks not usually covered by other insurance policies including "all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Id*. The effect of an all-risk policy is to broaden coverage. The initial burden lies with the insured to prove that the damage or loss was "fortuitous." *Id.* at 701.

**A. Was the loss fortuitous?**

"[T]he burden of demonstrating a fortuitous event is not an onerous one." *International Ship Repair & Marine Servs. v. St. Paul Fire & Marine Ins. Co.,* 944 F. Supp. 886, 893 (M.D. Fla. 1996) (hereinafter "*St. Paul Fire*"). *See also Egan v. Wash. Gen. Ins. Corp.,* 240 So. 2d 875, 876 (Fla. 4th DCA 1970) ("Plaintiff's burden of proof under such a policy is a light one: to make a *prima facie* case for recovery, he must show only that a loss has occurred."). The insured is not required to prove "the precise cause of loss to demonstrate fortuity." *Morrison Grain Co.*, 632 F.2d at 431.

A "fortuitous event" has been defined "as an event which, so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties." *LaMadrid,* 567 Fed. Appx. at 701 (internal citations omitted). A loss may be deemed fortuitous or accidental where it was

13

unforeseen, unexpected, unintended, unavoidable, or caused by the insured's own negligence. *See Great Lakes Reinsurance (UK) PLC v. Soveral*, Case No. 05-80923-CIV, 2007 WL 646981, 4 (S.D. Fla. Feb. 27, 2007) (citing *St. Paul Fire,* 944 F. Supp. 886). Losses are not fortuitous, however, where they result from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured. *See id.*

National Union argues that the loss here is not fortuitous because it resulted from corrosion, erosion, and/or ordinary wear and tear.[2] IAG, on the other hand, argues that the true "cause" of the loss was a failure of the bilge pumps due to an interruption in shore power, which would have been unforeseen, unexpected, unintended, and unavoidable by IAG. Alternatively, even if the bilge pump failure is not deemed the cause of the loss, IAG argues that the holes in the air conditioning coils were not due to normal wear and tear and would also qualify as fortuitous.

In *LaMadrid*, the Eleventh Circuit found that the insured carried its burden to show that the loss was fortuitous "by presenting expert testimony on the cause of the engine's failure, namely the failure of the relief valve, and by establishing that the unexplained loss occurred well before the end of the engine's projected lifespan." *Lamadrid v. Nat'l Union Fire Ins. Co.,* 567 Fed. Appx. 695, 701-702 (11th Cir. 2014). Similarly, IAG has presented expert testimony by Kiefer that the "age of the subject A/C condenser coil at failure was substantially less than is consistently achieved with normal wear and tear." Doc. 73-1 ¶12. *See also* Doc. 72 at 60:16 – 61:7 (testimony of Dr. Biery, noting that the holes are not a "common failure" of a six-year-old air conditioning unit, but may be the result of a design defect that reasonably could have taken six years to reveal itself).

---

[2] *See, e.g.*, docket entry 71 at p.14.  National Union's argument pertains to the inner tube of the air conditioning cooling coil and not the failure of the bilge pumps.

Thus, even if we assume, for summary judgment purposes, that National Union is correct about the "cause" of the loss, IAG has met its initial burden to show that the loss was "fortuitous."

Moreover, Layson determined that the boat was connected to shore power at the time of the loss. An inspection revealed that the selector switches for AC shore power and generator power were in the shore power position. The fact that the boat was connected to shore power makes the loss of power to the bilge pumps far more unexpected and unexplained. This failure of power was fortuitous. Plaintiff has met its initial burden. Accordingly, the burden shifts to the insurer, National Union, to show that the loss "'arose from a cause which is excepted.'" *Nat'l Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.*, 759 F.2d 873, 875 (11th Cir. 1985).

### B. Is the cause of the loss excepted under the policy?

National Union argues that this loss is excluded as damage resulting from one or both of the following two excepted causes: (1) "wear and tear, gradual deterioration, weathering, insects, mold, animals or marine life"; or (2) "corrosion, except electrolytic (stray current) corrosion." *See* Doc. 50 at p. 2-3. IAG argues that the loss was caused either by "erosion" or by the failure of the bilge pumps – neither of which, according to IAG, are excluded from the policy. This takes the court to a two-step inquiry, determining (1) the proximate cause of the loss; and (2) whether the determined cause falls under one of the policy's exceptions.

#### 1. What was the "cause" of the loss?

"Under federal maritime law 'the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result.'" *N.H. Ins. Co. v. Krilich,* 387 Fed. Appx. 940, 942-943 (11th Cir. 2010) (quoting *Lanasa Fruit S.S. & Imp. Co. v. Universal Ins. Co.,* 302 U.S. 556, 562 (1938)). However,

> courts analyzing problems of marine insurance causation have, as a rule, applied strictly the doctrine of *causa proxima non remota*

> *spectatur* ("the immediate not the remote cause is considered"). That is to say, courts seeking to determine the cause of a vessel's damage assign greater weight to the ultimate, efficient causes than to the temporally remote causes. *See, e.g., Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co.,* 302 U.S. 556, 563, 58 S. Ct. 371, 374, 82 L. Ed. 422 (1938) (noting, in admiralty case, that "cause which is truly proximate is that which is proximate in efficiency"); *Blaine Richards & Co. v. Marine Indemnity Insurance Co.,* 635 F.2d 1051, 1054 (2d Cir. 1980) (to "trace the origins of losses back to their remote causes" would violate the parties' reasonable understandings as to the scope of coverage).

*Tillery v. Hull & Co.*, 876 F.2d 1517, 1519 (11th Cir. 1989).

National Union argues that the loss of power to the bilge pumps, while closest in time to the vessel's submersion, is not the proximate cause of the submersion.[3] IAG, on the other hand, relies primarily on Hebert's testimony to argue that the cause of the loss was the failure of the bilge pumps. Doc. 57 at 30:4-14.

In *Weber v. New Hampshire Insurance Co.,* 480 So.2d 672 (Fla. 2d DCA 1986), the appellate court, though reversing the lower court's ultimate conclusion on coverage, affirmed the trial court's finding that malfunctioning bilge pumps were the cause of a loss "based on the testimony that, had the bilge pump been properly working, no matter what amount of water had entered the boat under any of the possibilities elicited at trial, the pump would have been sufficient to have pumped the water out of the boat and the boat would not have sunk." *Id.* at 673. Here, IAG has presented essentially identical testimony by Hebert. At his deposition, Hebert testified that "[i]f the bilge pump system works as it's designed to, this leak can occur at the rate that it's been defined to have occurred . . . . [a]nd the bilge pumps are more than capable of removing that

---

[3] The only time that Defendant's expert specifically identifies a "cause of loss" is in the first Techton report, which lists a chain of events rather than a single, proximate cause of loss. Doc. 54-1 at p. 3. In that original opinion, Techton stated that the water was coming in at 4700 gallons per hour - more than the bilge pumps could have handled. *Id.* However, his calculation of the amount of water coming through the a/c unit was, admittedly, mathematically incorrect and is changed to 600 gallons per hour in his later report. Doc. 50-8 at p. 1. Based on this corrected calculation, it was far less than the 2000 gallon per hour bilge pump capacity, contrary to the conclusion in Techton's first report. *Id.*

16

amount of water from the bilge. Doc. 57 at 31:20-32:10.  Also, Keifer testified that the holes in the air conditioning coil were so small, they would not present a risk of sinking the boat as long as the bilge pumps were operational.  Doc. 58 at 22:3-7.

At the oral argument, Defendant argued that "speculation that the bilge pumps failed is not enough" to overcome summary judgment and cited *Axis Reinsurance Co. v. Resmondo,* Case No. 8:08-cv-569-T-33TBM, 2009 U.S. Dist. LEXIS 122778, 2009 AMC 2597 (M.D. Fla. May 8, 2009) and *J & A Fleeting, Inc. v. Fireman's Fund McGee Marine Underwriters,* CASE NO. 0:03-cv-217-HRW, 2006 U.S. Dist. LEXIS 81, 2006 AMC 535 (E.D. Ky. Jan. 3, 2006).[4] However,  IAG has presented more than speculation. In fact, Defendant conceded for purposes of summary judgment that: (1) The vessel's bilge pump capacity was adequate to keep the vessel afloat. Doc. 71 at p. 5; Doc. 73 at p. 3; (2) At some point, there was an interruption of shore side electricity to the vessel. Doc. 50 at p. 1; Doc. 73 at p. 7; (3) The vessel's bilge pumps eventually failed due to depletion of the vessel's batteries. Doc. 71 at p. 5; Doc. 73 at p. 7; and (4) The vessel would not have sunk but for the failure of the bilge pumps. Doc. 50 at p. 7, Doc. 73 at p. 7.

Defendant's reliance on *Resmondo* is misplaced. In *Resmondo*, the Eleventh Circuit determined that the loss was not fortuitous because

> the undisputed evidence is that the water intrusion and ultimate sinking of the vessel was caused by the failure of the gimbal ring and that such failed due to a gradual deterioration resulting from wear, tear, and corrosion. . . . Resmondo offers no contrary evidence on the matter of probable cause or to the expert opinion that the failure of the gimbal ring was ultimately due to wear, tear and corrosion. At best, he can argue with the expert's conclusions and urge that it does not necessarily follow that the failure of the worn gimbal ring would cause the water intrusion resulting in the sinking

---

[4] Defendant has also relied on *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.,* Case No. 06-60889-CIV-COHN/SELTZER, 2009 U.S. Dist. LEXIS 114568 (S.D. Fla. Dec. 9, 2009). That case is not helpful here because, there, the parties agreed on the cause of the loss and only disputed whether that cause was covered under the policy as a manufacturer's defect. *Id.* at 10-12.

> of the vessel. Perhaps that is so in the abstract, but that does not alter the undisputed evidence on causation now before the court.

2009 U.S. Dist. LEXIS 122778 at 25-26.

Defendant analogizes *Resmondo* to this case because a series of events led to the sinking of the vessel and the court in *Resmondo* found that the first failure was the proximate cause of the loss. Therefore, according to Defendant, this Court should find that the first failure (water entering the vessel through the holes in the air conditioning coil) was the proximate cause of IAG's loss. However, unlike *Resmondo,* IAG has presented evidence, and Defendant has chosen not to dispute that evidence, that the bilge pumps lost shore side power and, therefore, failed. Also unlike *Resmondo,* there is no evidence here that the failure of the bilge pumps resulted from the water intrusion. In *Resmondo* the evidence was undisputed that the entire chain of events was attributable to the failure of the gimbal ring. Here, there is absolutely no suggestion that the failure of the bilge pumps was caused by the holes in the air conditioning coil. Instead, there is some indication of the opposite – that the failure of the bilge pumps exacerbated the issues with the air conditioning coil by causing the water to back up into the air conditioning unit. The Court in *Resmondo* relied heavily on Resmondo's failure to present evidence to support his arguments. That is not the case here, where IAG has presented its own experts and National Union has accepted IAG's version of the facts.

Likewise, in *J&A,* the Court found a lack of evidence to show that there was an interruption in shore power. The only evidence Plaintiff presented there was "a statement of the on-shore terminal employee as to the fact that his computer had gone down at some point, but no evidence to affirmatively establish a power outage or any other concrete event or that this mysterious event indeed caused the boat to sink." Again, this case does not present such a lack of evidence, given

the testimony of Plaintiff's experts and the fact that Defendant does not dispute, at least for purposes of summary judgment, that there was an interruption of shore side electricity.[5]

IAG's experts have testified that the vessel had to be hooked up to shore side electricity in order for the air conditioner to have been running. Likewise, this power supply had to be interrupted in order for the bilge pumps' batteries to die. When the shore electricity turned back on, the air conditioner would have turned back on, but the bilge pumps' batteries would have had to be recharged before the pumps could operate again. There is no indication that the bilge pumps were malfunctioning in any way at the time of the loss. Instead, even years later the pumps were operable when connected to a power source. Although it is clear that water entered the vessel through holes in the inner cupronickel tubing of the vessel's air conditioning coil, the failure of the bilge pumps was the proximate cause of the loss because, as is stipulated, if the bilge pumps had not failed, the boat would not have sunk.

### 2. *Does the determined cause fall under one of the policy's exceptions?*

Defendant offers no basis for the exclusion of the determined cause of this loss: failure of the bilge pumps due to interruption of shore power. It is Defendant's burden to show that IAG's loss was excluded under the insurance policy and Defendant has not met that burden.

Accordingly, this Court finds, as a matter of law, that the loss of the *It's All Good* was a covered loss under the all risks Policy. Therefore, Defendant's Motion for Summary Judgment must be denied and Plaintiff's Motion for Summary Judgment must be granted as to liability.

---

[5] Defendant also relies on *Travelers Property Cas. Ins. Co. v. Peddle*, 158 Fed.Appx 248 (11th Cir. 2005), an unpublished decision, in support of its motion for summary judgment. This two paragraph opinion does not provide sufficient facts for the Court to determine its applicability to this case. Moreover, contrary to Defendant's assertion, it is not binding on this Court.

V.  **Damages**

Plaintiff seeks damages (plus prejudgment interest and attorneys' fees) as follows:

| | |
|---|---|
| Storage at Embree Marine | $199,280.78 |
| Estimated Total Repairs | $344,068.89 |
| Towing and Salvage | $5,900.00 |
| **TOTAL** | **$549,249.67** |

Defendant disputes these amounts. Here, legal and factual issues exist as to the amount of damages. Therefore, this case will proceed to trial on the issue of damages.[6]

**ORDERED AND ADJUDGED**:

1.  Defendant's Motion for Summary Judgment (Doc. 50) is DENIED.

2.  Plaintiff's Motion for Summary Judgment (Doc. 51) is GRANTED in part, as to liability, and DENIED in part, as to damages.

3.  A telephonic status conference will be scheduled by separate notice. The purpose of the status conference is to reschedule this case for trial.

**DONE AND ORDERED** in Tampa, Florida on September 3, 2015.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[6] The Court notes that in the Joint Pretrial Statement there is a reference to the Defendant's counterclaim. However, a review of docket entry 41 reveals that no counterclaim was asserted in response to the amended complaint. *See Penn. Nat. Mut. Cas. Ins. Co. v. Snider,* 996 F.Supp.2d 1173, 1180 (M.D. Ala. 2014).